IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALFRED ATSUS,** : | |
|     Plaintiff, : | |
| : | |
| v. : | CIVIL ACTION NO. _____ |
| : | |
| **THE ATLANTIC** : | |
| **MONTHLY GROUP, LLC,** : | |
| : | |
| **JEFFREY GOLDBERG, and** : | |
| : | |
| **ARIEL SABAR,** : | |
|     Defendants. : | **JURY TRIAL DEMANDED** |

**COMPLAINT**

AND NOW, comes the Plaintiff, ALFRED ATSUS (hereinafter "Atsus"), by and through his attorneys, Jason J. Mattioli, Esquire and Michael J. Ossont, Esquire of the Mattioli Law Firm, and files the following Complaint against THE ATLANTIC MONTHLY GROUP, LLC (hereinafter referred to as "The Atlantic"), JEFFREY GOLDBERG (hereinafter "Goldberg"), and ARIEL SABAR (hereinafter "Sabar") and in support thereof avers as follows:

**INTRODUCTION**

1. This claim is brought by Plaintiff Atsus for claims of defamation and false light against all Defendants.

1

2. On or about June 6, 2023, Atsus was indicted by the United States Attorney's Office for the Middle District of Pennsylvania and charged with Conspiracy to Commit Theft of Major Artwork, Concealment and Disposal of Major Artwork, and Interstate Transportation of Stolen Property along with related charges.

3. Specifically, it was alleged that Atsus was involved in the concealment or disposal of paintings stolen from the Everhart Museum in Scranton, Pennsylvania; concealment or disposal of a firearm taken from the Space Farms Zoo and Museum located in Wantage, New Jersey; and concealment or disposal of artwork and firearms from Ringwood Manor located in Ringwood, New Jersey.

4. Atsus was not alleged to have been involved in any sports memorabilia heists whatsoever.

5. Additionally, Atsus was not alleged to have been present at any of the locations to case those locations or to have been present at the time of any burglaries or thefts.

6. On January 13, 2025, jury selection began so that Atsus could stand trial for the alleged crimes, for which he maintained his innocence.

7. On January 14, 2025, with opening statements scheduled to begin, the Atlantic, at the direction of its editor, Goldberg, published an article written by Sabar entitled, "THEY STOLE YOGI BERRA'S WORLD SERIES RINGS. THEN THEY DID SOMETHING REALLY CRAZY. *The childhood friends behind the most*

*audacious string of sports-memorabilia heists in American history*" (hereinafter "the article"). A copy of the article is attached as Exhibit "A".

8. The article, based on Sabar's interview of Thomas Trotta, Jr. (hereinafter "Trotta"), defames Atsus and places him in a false light.

9. Prior to the jury deliberating, the United States withdrew the allegations against Atsus with respect to the thefts from Ringwood Manor.

10. After jury deliberations, Atsus was acquitted of any wrongdoing and found not to be a part of the Conspiracy between Trotta and the others. Additionally, he was found not to have concealed any artwork or firearms.

11. As a result of the Defendants' actions, Atsus has sustained both economic and reputational harm in Pennsylvania.

**PARTIES**

12. Plaintiff, Alfred Atsus, is a competent adult who resides in Lackawanna County, Pennsylvania. Atsus is a self-employed HVAC contractor.

13. The Atlantic is a District of Columbia corporation with its principal place of business in the District of Columbia. In January of 2025, the Atlantic published the article at the direction of its editor Goldberg and written by Sabar which defamed and placed Atsus in a false light. The Atlantic's address is 600 New Hampshire Avenue, NW FL 4, Washington, D.C. 20037.

3

14. Jeffrey Goldberg is a natural person who is believed to reside in the District of Columbia. At all times relevant hereto, Goldberg was the editor at The Atlantic with an address of 600 New Hampshire Avenue, NW FL 4, Washington, D.C. 20037.

15. Ariel Sabar is a natural person who is believed to reside in the District of Columbia at 707 14th St, Washington, D.C. 20003. At all times relevant hereto, he authored the article in question that was published in the Atlantic that contained false, defaming information about Atsus and placed Atsus in a false light.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

17. Plaintiff, Atsus, is a citizen of the Commonwealth of Pennsylvania. Defendants are citizens of the District of Columbia, and complete diversity exists between the parties.

18. This Court has personal jurisdiction over Defendants because Defendants purposefully directed defamatory statements about Plaintiff in Pennsylvania, caused harm to Plaintiff in Pennsylvania, and/or otherwise engaged in conduct giving rise to this action within this Commonwealth.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of Pennsylvania, and the reputational and economic harm to Plaintiff was suffered in this District.

20. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## FACTUAL BACKGROUND

21. On June 6, 2023, the United States District Court for the Middle District of Pennsylvania filed an indictment that included allegations that Atsus was involved in a Criminal Conspiracy with Trotta, Nicholas Dombek, Damien Boland, Joseph Atsus and others regarding burglaries and thefts occurring between August of 1999 through September of 2019.

22. Specifically in the indictment, Atsus was alleged to have concealed or disposed of paintings stolen from the Everhart Museum in Scranton, Pennsylvania; a firearm taken from the Space Farms Zoo and Museum located in Wantage, New Jersey; and disposal of artwork and firearms from Ringwood Manor located in Ringwood, New Jersey.

23. Atsus vigorously denied his involvement with the other individuals in committing any crimes and pleaded not guilty to the charges.

24. A trial regarding the allegations would eventually begin on January 13, 2025, with jury selection.

25. At some point prior to January 13, 2025, a writer for the Atlantic, Defendant Sabar, would repeatedly contact and interview one of the government's cooperating witnesses, Trotta.

26. On December 4, 2024, Sabar sent an email to Plaintiff's counsel requesting comment on questions raised by his interviews with Trotta.

27. On that same date, Plaintiff's counsel responded stating that any comments made by Trotta with respect to Atsus were "absolutely ridiculous and patently absurd."

28. Furthermore, it was noted that "any articles published concerning the aforesaid alleged criminal behavior of [Atsus] will be met with a defamation of character lawsuit . . ." A copy of the email exchange is attached as Exhibit "B".

29. While Atsus grew up with Trotta and considered him a family friend, he denied any involvement with Trotta's criminal enterprise.

30. All of the allegations against Atsus stem from statements Trotta had given to investigators of the case.

31. Throughout the litigation of the criminal matter, not one iota of corroboration about the allegations Trotta made about Atsus came to light.

32. Sabar did nothing to attempt to corroborate the information provided by Trotta about Atsus despite being advised the allegations were false.

33. Furthermore, the article focuses on the burglaries and thefts by Trotta and others with respect to sports memorabilia.

34. Atsus was not alleged anywhere within the indictment to have been involved, present or in possession of any items taken from these sports memorabilia heists.

35. Interestingly, on January 14, 2025, the day that opening statements and the beginning of the trial occurred, the Atlantic, at the direction of Goldberg, published the article written by Sabar entitled "THEY STOLE YOGI BERRA'S WORLD SERIES RINGS. THEN THEY DID SOMETHING REALLY CRAZY. The childhood friends behind the most audacious string of sports-memorabilia heists in American history". *See*, Exhibit "A".

36. The article paints Atsus as a member of Trotta's "crew" and includes a picture of Atsus taken from his high school yearbook, despite the absence of any evidence supporting such characterization.

37. Additionally, the article discusses Trotta and "other members" casing the Everhart Museum prior to burglarizing it.

38. Atsus was neither alleged to have cased the Everhart Museum nor was it alleged that he was present at the time of the burglary.

39. The article goes on to state that "The crew cased The National Baseball Hall of Fame, in Cooperstown, New York, for years, but gave up after discovering that the diamonds on the championship belt they were after had been replaced by inexpensive replicas."

40. There have been no allegations that Atsus was involved in casing The National Baseball Hall of Fame.

41. The article claims that from the summer of 2011 through late 2013 "Trotta's crew" made nearly $500,000.

42. There have been no allegations or evidence to suggest that Atsus ever received proceeds from any of Trotta's marauding.

43. Prior to the conclusion of trial, the United States Attorney withdrew the allegations regarding Ringwood Manor based on the fact that no witness stated that Atsus was involved in any manner with the burglary or thefts from that location or that he possessed any items that were stolen therefrom.

44. Ultimately, Atsus was acquitted of all charges because there was no other corroborating evidence whatsoever that Atsus was involved in any way besides the word of Trotta.

45. Clearly, Trotta embellished to both investigators and Sabar regarding Atsus' alleged involvement.

46. Sabar had a responsibility to corroborate the statements of Trotta.

47. The article was published in the Atlantic magazine and the Atlantic online to over a million subscribers, including individuals who live in Lackawanna County.

48. The Atlantic is believed to have had between 1.1 and 1.4 million subscribers in late 2024/early 2025.

49. Furthermore, Atsus, a self-employed HVAC contractor, suffered reputational harm and economic loss as a result of the article written by Sabar and published by the Atlantic at the direction of the editor, Goldberg.

50. Atsus is a private individual who did not voluntarily inject himself into any public controversy, did not seek public attention, and had no meaningful access to the media to counteract the false statements published by the Defendants.

## COUNT I – DEFAMATION
## ALFRED A. ATSUS v. ALL DEFENDANTS

51. The preceding paragraphs are incorporated herein by reference as if fully set forth here at length.

52. The statements contained in the article identified and described above are entirely false insofar as they reflect upon Atsus' conduct as well as his character and reputation.

53. Defendants knew or should have known after reasonable investigation that the statements contained in the article were false when made, and defendants published them either intentionally, maliciously, negligently, carelessly, or with

9

reckless disregard for their truth or falsity.

54. The statements at issue were presented as factual assertions, were capable of being proven true or false, and were not expressions of opinion, rhetorical hyperbole, or fair comment.

55. The false and defamatory statements contained in the article were printed, published and circulated in the Atlantic both in print and digitally online on January 14, 2025 and reached Lackawanna County and elsewhere, and were widely published and circulated among and read by over one million subscribers including Atsus' business clients and associates, customers, neighbors, friends and diverse other persons.

56. The false and defamatory statements contained in the article applied to Atsus; were understood by the recipients of the statements to have defamatory meaning; and were understood or reasonably understood by the recipients as intended to be applied to Plaintiff Atsus.

57. The publication of the false and defamatory statements contained in the article has been and continues to be republished and Atsus likewise demands presumed, compensatory, economic and punitive damages from the harm flowing from any and all such republications of the false and defamatory statements in addition to damages from the harm flowing from its initial publication.

58. To the extent defendants may attempt to assert in their own defense privileged character of the occasion on which the false and defamatory statements were published, any such conditional privilege was abused by the defendants and is thereby waived and forfeited.

59. The article was not a fair, accurate, or complete report of any judicial proceeding, indictment, or public record and therefore is not protected by the fair report privilege.

60. The article contained and represented as true false and highly defamatory statements concerning Atsus and his involvement with Trotta and others in a criminal conspiracy.

61. Particularly the article paints Atsus as an actor in the burglaries of several high-profile sports museums as well as other art institutions which is untrue.

62. The article contained and represented as true that Trotta and his crew, including Atsus, acquired large sums of money in return for the items that were stolen. Atsus never acquired funds from Trotta's enterprise.

63. Additionally, a high school yearbook photo of Atsus is depicted in the article.

64. The article maliciously, intentionally, negligently, carelessly and/or with reckless disregard for the truth, by words, innuendo, inference and manner in which they were presented, held Plaintiff Atsus out to public scorn and ridicule,

attributed improper conduct to Plaintiff Atsus and defamed him.

65. The false and defamatory statements were not privileged nor did the article constitute fair comment on matters of public concern or interest, with respect to Atsus.

66. The false and defamatory statements were published with knowledge that the statements, innuendo, inference and manner in which they were presented were false and/or with reckless disregard for whether said material was false, said conduct constituting actual malice.

67. The article contained distortions, misrepresentations, misstatements of fact, omissions of fact and edited material designed to cast Atsus in a false light.

68. The article was presented in a negligent manner without adequately investigating the underlying facts regarding Atsus, or anyone for that matter.

69. The statements and implications set forth above were false, and defendants either knew or should have known at the time of publication that they were false.

70. The statements and implications set forth above constitute defamatory publications which are actionable per se, are libels per se, and were published with actual malice.

71. The above statements have severely injured and caused harm to Plaintiff Atsus in that they have tended to (a) blacken his reputation; (b) expose him

to hatred, contempt, ridicule and humiliation; (c) ascribe to him characteristics incompatible with the proper conduct of his business; and (d) injure him in the practice of that business.

72. As a direct and proximate result of the intentional, malicious, reckless, negligent and/or careless statements and charges contained in the article and its printing, publication and circulation in the Atlantic on January 14, 2025 in Lackawanna County and throughout the world, Atsus' reputation and esteem in the community have been adversely affected.

73. As a further result of the aforementioned defamatory article, third persons have been deterred from associating with or otherwise doing business with Atsus.

74. As a further result of the defamatory article, Atsus has been exposed to ridicule, hatred and contempt.

75. As a further result of the defamatory article, Atsus has sustained and will sustain in the future, a loss of income and earning capacity.

76. As a further result of the defamatory article, Atsus has sustained grave mental anguish, humiliation and a loss of enjoyment of life.

77. The conduct of all defendants in publishing the defamatory article was outrageous and the defendants acted in bad faith and/or with reckless disregard and indifference to the truth and to the interests of Atsus for which he claims an

additional sum of punitive damages.

78. Because of the defendants' malicious publication of the false and defamatory statements complained herein, Atsus is entitled to recover from defendants, jointly, severally and individually, such presumed, compensatory and economic damages in excess of $75,000.00 as will compensate him for his actual financial loss, injury to his personal and business reputation, and/or mental anguish, suffering and severe emotional distress; and in addition, punitive damages which will punish defendants for their malicious libels, and will deter them from repetition of similar libels in the future.

WHEREFORE, the Plaintiff, Alfred A. Atsus claims damages from defendants Atlantic Monthly Group, LLC, Jeffrey Goldberg and Ariel Sabar, jointly, severally and individually, in an amount in excess of $75,000.00, together with interest and costs.

## COUNT II – FALSE LIGHT
## ALFRED A. ATSUS v. ALL DEFENDANTS

79. The preceding paragraphs are incorporated herein by reference as if fully set forth here at length.

80. The article published without regard to its truth or falsity, also created false impressions by repeatedly, widely, and extensively publicizing information which stated or implied falsehoods about Atsus and placed him before the public in a false light of a kind highly offensive to a reasonable person.

81. The article contained distortions, misrepresentations, misstatements of fact, omissions of fact, selective quotations, imagery, timing, and edited material designed to cast Atsus in a false light.

82. As a direct and proximate result of the intentional, malicious, reckless, negligent and/or careless statements and charges contained in the article described above and its printing, publication and circulation in the Atlantic and online on January 14, 2025 in Lackawanna County and around the world, Atsus sustained the damages as aforementioned.

WHEREFORE, the Plaintiff, Alfred A. Atsus claims damages from defendants Atlantic Monthly Group, LLC, Jeffrey Goldberg and Ariel Sabar, jointly, severally and individually, in an amount in excess of $75,000.00, together with interest and costs.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for the following relief:

A. Injunctive relief that the Court deems just and proper following an adjudication on the merits;

B. Compensatory monetary relief in the amount to be determined at trial;

C. Punitive damages;

D. Costs of suit; and

E. Such other or further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

    Respectfully submitted:
    **THE MATTIOLI LAW FIRM**
By:    ***/s/ Jason J. Mattioli***
    Jason J. Mattioli, Esquire
    Jaylaw344@yahoo.com
    Pa. ID: 88766

    ***/s/ Michael J. Ossont***
    Michael J. Ossont, Esquire
    Mjossont.mlf@gmail.com
    Pa. I.D.: 310437
    425 Biden Street, Ste 300
    Scranton, PA 18503
    *Attorneys for the Plaintiff*